Solt v. Seiler Corp.                    CV-92-572-SD  01/23/95

UNITED STATES DISTRICT COURT FOR THE

DISTRICT OF NEW HAMPSHIRE


Gail Solt


        v.                                  Civil No. 92-572-SD


The Seiler Corporation



                           O R D E R


     In this diversity action, plaintiff Gail Solt seeks recovery

for wrongful termination against her former employer, defendant

Seiler Corporation.  Presently before the court is defendant's

renewed motion for summary judgment, to which plaintiff objects.



                          Background

     Seiler Corporation is in the business of providing food

services to various facilities such as hospitals and

universities.  At all times relevant to this action, Seiler was

under contract to provide food services and food service

management to the New Hampshire Hospital.[1]

_____

     [1]New Hampshire Hospital is part of New Hampshire's Division
of Mental Health and Developmental Services.  See generally New
Hampshire Revised Statutes Annotated (RSA) 135-C:1 to C:67 (1990
& Supp. 1993).

Gail Solt was hired by Seiler as Chief Clinical Dietician for the New Hampshire Hospital in January of 1989. In this capacity, plaintiff had the authority to hire and fire the dieticians and diet assistants who worked under her at the hospital.

In December of 1990, plaintiff hired Ann O'Bara as a dietician for the hospital.[2] Plaintiff experienced "ongoing problems" with O'Bara's job performance. Deposition of Gail Solt at 35. Specifically, O'Bara "had incomplete charts. She was late on following patients. She had misinformation . . . in files, incomplete information." Id. As a result of these ongoing problems, a decision was made to terminate O'Bara's employment with the hospital. Dana Lancaster, Food Service Director at the hospital and plaintiff's immediate supervisor, states that the decision to terminate O'Bara "was a mutual agreement between administration, personnel, Gail [Solt] and myself." New Hampshire Department of Employment Security Hearing Transcript (hereinafter DES Transcript) at 33. See also Deposition of Dana Lancaster at 23. Plaintiff asserts she was advised and directed by the hospital administration and the Seiler management staff to terminate O'Bara's employment.

_____

[2]In this position, O'Bara was an employee of the State of New Hampshire.

On December 4, 1991, with the knowledge and consent of her supervisors, plaintiff terminated O'Bara's employment at the hospital. Following O'Bara's termination, plaintiff found herself to be the object of increasing animosity and hatred from the hospital staff. See Solt Deposition at 55-56, 58. Plaintiff states that "[t]here was a tremendous level of hostility and hate out on the wards that I had never had to deal with from a wide range of staff." Solt Deposition at 58.

For example, plaintiff states that after the firing certain staff members refused to meet with her or to do work for her. Solt Deposition at 58, 73. Plaintiff further states,

> I had charts that I didn't have availability to. I would call or try and get charts that all of a sudden didn't exist. . . .
>     . . . .
>     I would ask for a chart and be told that it wasn't available. And I would call down for the chart and be told it was available. And I'd go down, and it was gone, or, "Oh, we must have been wrong," or, "It wasn't there," you know, when they knew I was coming to get the chart. Or I'd say, "Put a hold on it," or "I'm on my way down," situations like that.

Id. at 73, 147. This problem of getting access to patient charts was "ongoing." Id. at 147-48.

Plaintiff also experienced problems with the hospital's physicians and physician-assistants requiring her to do unnecessary patient consults. Solt Deposition at 70; DES

3

Transcript at 15, 42, 50-51.

In addition, letters from members of the hospital staff and from the physicians calling for O'Bara's reinstatement were being circulated around the hospital. Solt Deposition at 62; Lancaster Deposition at 14; DES Transcript at 8, 33, 49-50. Signs or posters soliciting donations for the O'Bara family were also placed around the hospital. Lancaster Deposition at 14, 26; DES Transcript at 43.

Plaintiff maintains that she was unable to perform her job under these hostile conditions.

Dana Lancaster acknowledges that plaintiff "was stressed out" following O'Bara's termination, Lancaster Deposition at 17, and that the state employees were blaming her for O'Bara's termination, id. at 31. Lancaster further states that Chet Batchelder, the hospital's administrator, was "concerned" about "whether or not [plaintiff] was going to be able to continue handling the situation" because "there was still a lot of animosity at the hospital" toward her. Id. at 29.

Plaintiff asserts that she made repeated requests for some show of support from Seiler and the hospital for O'Bara's termination, but that her requests were either turned down or ignored. For example, plaintiff maintains that she asked Donna

4

Jones and Dave Giroux[3] to be present at the hospital on the day of O'Bara's termination, but "[t]hey both refused." Solt Deposition at 56-57. Plaintiff further asserts that she asked Giroux and Lancaster to put out a memo "that listed all of the people who were involved in the decision" to terminate O'Bara, but her requests were denied. Id. at 56-57, 61-62.

Plaintiff also asked Lancaster to follow up on several of the problems she had been experiencing with the hospital staff, but asserts that he never followed up on those problems or responded to her concerns. Id. at 61-63.

Plaintiff maintains she became sick from the stress she was under following O'Bara's termination. DES Transcript at 6. As a result thereof, plaintiff took a medical leave of absence from December 20, 1991, through January 3, 1992. Solt Deposition at 97.

On July 13, 1992, plaintiff terminated her employment with Seiler at New Hampshire Hospital, citing "many previous months of relentless harassment, hostility and 'hate directed at me.'" Solt Letter of Resignation (attached to Plaintiff's Objection to Defendant's First Motion for Summary Judgment as Exhibit C). The

---

[3]At all times relevant to this action, Donna Jones was Seiler's Regional Clinical Manager and David Giroux was Seiler's Regional Operations Manager. Deposition of Donna Jones at 12; Deposition of David Giroux at 6.

5

"furor" over O'Bara's termination "dissipated" following plaintiff's resignation.  Lancaster Deposition at 40-41.

Discussion

## 1.  Summary Judgment Standard

Under Rule 56(c), Fed. R. Civ. P., summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

> Summary judgment is a procedure that involves shifting burdens between the moving and the nonmoving parties.  Initially, the onus falls upon the moving party to aver "'an absence of evidence to support the nonmoving party's case.'"  Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)).  Once the moving party satisfies this requirement, the pendulum swings back to the nonmoving party, who must oppose the motion by presenting facts that show that there is a "genuine issue for trial."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986) (citing Fed. R. Civ. P. 56(e)) . . . .

LeBlanc v. Great American Ins. Co., 6 F.3d 836, 841 (1st Cir. 1993), cert. denied, ___ U.S. ___, 114 S. Ct. 1398 (1994).  In determining whether summary judgment is appropriate, the court construes the evidence and draws all justifiable inferences in

6

the nonmoving party's favor.  Anderson, supra, 477 U.S. at 255.

## 2.  Wrongful Termination

In order to assert a claim for wrongful termination under New Hampshire law, "a plaintiff must establish two elements: one, that the employer terminated the employment out of bad faith, malice, or retaliation; and two, that the employer terminated the employment because the employee performed acts which public policy would encourage or because he refused to perform acts which public policy would condemn."  Short v. School Admin. Unit No. 16, 136 N.H. 76, 84, 612 A.2d 364, 370 (1992) (citing Cloutier v. A & P Tea Co., Inc., 121 N.H. 915, 921-22, 436 A.2d 1140, 1143-44 (1981)).

Defendant moves for summary judgment on the ground that plaintiff's evidence is insufficient to prove (1) that she was constructively discharged and (2) that she was terminated out of bad faith and for performing acts which public policy would encourage.

### a.  Constructive Discharge

"'Constructive discharge occurs when an employer renders an employee's working conditions so difficult and intolerable that a reasonable person would feel forced to resign.'"  Godfrey v.

7

Perkin-Elmer Corp., 794 F. Supp. 1179, 1186 (D.N.H. 1992) (quoting Seery v. Yale-New Haven Hospital, 17 Conn. App. Ct. 532, 554 A.2d 757, 761 (1979)).  "'Through the use of constructive discharge, the law recognizes that an employee's "voluntary" resignation may be, in reality, a dismissal by the employer.'" Id. (quoting Seery, supra, 554 A.2d at 761 (citation omitted)).

In order to find that an employee has been constructively discharged, "'"the trier of fact must be satisfied that the . . . working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign."'"  Id. (quoting Calhoun v. Acme Cleveland Corp., 798 F.2d 559, 561 (1st Cir. 1986) (quoting Alicea Rosado v. Garcia Santiago, 562 F.2d 114, 119 (1st Cir. 1977))).  "This standard is an objective one which focuses upon the reasonable state of mind of the employee."  Id. (citing Calhoun, supra, 798 F.2d at 561).

In her deposition, plaintiff details the circumstances which led to her allegedly constructive discharge.  She asserts that all of the anger of the hospital staff over O'Bara's termination was directed at her.  In addition, plaintiff experienced numerous difficulties in her day-to-day dealings with the hospital staff following O'Bara's termination.  Plaintiff further maintains that she made repeated requests for some showing of support for the

termination from Seiler and the hospital administration. However, these requests were denied. Plaintiff contends that the combination of all of these factors made her job unbearable and forced her to resign.

On the basis of the evidence before it, the court finds that a trier of fact could conclude that, under the circumstances described by plaintiff, a reasonable person in her shoes would have felt compelled to resign.

### b. Bad Faith, Malice, or Retaliation

"'[A] termination by the employer of a contract of employment at will which is motivated by bad faith or malice or based on retaliation is not in the best interest of the economic system or the public good and constitutes a breach of the employment contract.'" Cloutier, supra, 121 N.H. at 920, 436 A.2d at 1143 (quoting Monge v. Beebe Rubber Co., 114 N.H. 130, 133, 316 A.2d 549, 551 (1974)). The rationale underlying this principle "is that there is an implied covenant in every contractual relationship that the parties will carry out their obligations in good faith." Id. (citations omitted). The existence of bad faith can "be concluded from the manner in which the plaintiff was discharged." Id., 121 N.H. at 921, 436 A.2d at 1144.

9

The evidence presented by plaintiff reveals that, as Chief Clinical Dietician, she carried out the decision made by Seiler and New Hampshire Hospital to terminate O'Bara's employment. Said termination caused a backlash by the hospital staff directed at plaintiff. Plaintiff complained repeatedly about the problems she was experiencing with the hospital staff, but defendant failed or refused to take any action.

The court finds that the evidence of defendant's failure to remediate the hostile environment created as a result of O'Bara's termination is sufficient to create a genuine issue of material fact as to whether defendant acted in bad faith. Cf. Godfrey, supra, 794 F. Supp. at 1187 (finding that an employer's "lack of investigation" of an employee's claims of harassment "and its failure to remediate the discriminatory practices, would seem sufficient to meet" the bad faith element of the wrongful discharge test).

c. The Public Policy Element

The public policy allegedly contravened by an employee's wrongful discharge "can be based on statutory or nonstatutory policy." Cilley v. New Hampshire Ball Bearings, Inc., 128 N.H. 401, 406, 514 A.2d 818, 821 (1986).

"[O]rdinarily the issue of whether a public policy exists is

10

a question for the jury." Short, supra, 136 N.H. at 84, 612 A.2d at 370 (citing Cloutier, supra, 121 N.H. at 924, 436 A.2d at 1145). See also Cilley, supra, 128 N.H. at 406, 514 A.2d at 821 ("In most instances, it is a question for the jury whether the alleged public policy exists."); Cloutier, supra, 121 N.H. at 924, 436 A.2d at 1145 ("The existence of a 'public policy' . . . calls for the type of multifaceted balancing process that is properly left to the jury in most instances."). However, "at times the presence or absence of such a public policy is so clear that a court may rule on its existence as a matter of law . . . and take the question away from the jury." Short, supra, 136 N.H. at 84, 612 A.2d at 370 (citing Cloutier, supra, 121 N.H. at 924, 436 A.2d at 1145).

Plaintiff was employed by Seiler at New Hampshire Hospital as one of several managerial employees Seiler was obligated to provide under its contract with the hospital. She asserts that her termination of O'Bara was an act required for the proper performance of said contract. Plaintiff further asserts that she terminated O'Bara on Seiler's behalf and with its knowledge and consent. Plaintiff maintains that defendant violated public policy by terminating her for performing her job as directed and for performing an act that was required for proper performance of Seiler's contract with the hospital.

11

Seiler argues that no public policy has been contravened here because plaintiff's termination resulted from her disagreement with Seiler's alleged managerial decision not to support "her" decision to fire O'Bara.

The discharge of an at-will employee "for business reasons is not actionable" under New Hampshire law "unless there is sufficient showing to support a factual finding that the management decision in question is contrary to public policy." Vandegrift v. American Brands Corp., 572 F. Supp. 496, 499 (D.N.H. 1983).

This court is of the opinion that a reasonable jury could find that Seiler's refusal to publicly support plaintiff's termination of O'Bara was a business or management decision. However, such a jury could also find that a countervailing public policy exists that required Seiler to publicly support the termination of O'Bara where Seiler was involved in making the decision to terminate O'Bara and that termination was carried out by plaintiff on Seiler's behalf and for its benefit.

The court finds that the weighing of all of these factors in an effort to strike the appropriate balance between the interests of the defendant as an employer and the interests of the plaintiff as an at-will employee is a task properly left to a jury.

12

## Conclusion

For the reasons set forth herein, the court finds that the plaintiff has met her burden of presenting sufficient evidence to establish a genuine issue as to whether she was wrongfully terminated by defendant.  Defendant's renewed motion for summary judgment (document 34) is therefore denied.

SO ORDERED.

_____
Shane Devine, Senior Judge
United States District Court

January 23, 1995

cc:  Matthew J. Lahey, Esq.
     Robert S. Molloy, Esq.

13